**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 20 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

SCOTTSDALE INSURANCE
COMPANY,

Plaintiff-Appellee,

v.

JAMES L. GARDNER TRUST;
FORREST WEIRICK; JAMES L.
GARDNER, II, as Trustee of the
James L. Gardner Testamentary Trust;
MARILYN L. GARDNER, as
Executrix for the Estate of James L.
Gardner,

Defendants-Appellants.

No. 01-3395
(D.C. No. 98-CV-1343-MLB)
(D. Kan.)

**ORDER AND JUDGMENT** *

Before **SEYMOUR** , **EBEL** , and **O'BRIEN** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination

---

* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

Plaintiff-appellee Scottsdale Insurance Company (Scottsdale) filed this declaratory judgment action in the United States District Court for the District of Kansas against the James L. Gardner Trust, James L. Gardner, II, as Trustee of the James L. Gardner Testamentary Trust, Marilyn L. Gardner, as Executrix for the Estate of James L. Gardner, and Forrest Weirick (collectively, the Owners).  Scottsdale sought a declaration that it had no duty to defend the Owners in a lawsuit filed against them in state court in Sedgwick County, Kansas.  The district court entered summary judgment in favor of Scottsdale, concluding that Scottsdale did not have a duty to defend the owners under the insurance policy at issue.[1]  Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm the entry of summary judgment in favor of Scottsdale.

I.

The Owners owned a shopping center in Wichita, Kansas.  One of the commercial properties located within the shopping center was a vacant building that had previously been used as a supermarket.  On September 19, 1996,

---

[1]    The district court also denied the Owners' motion for partial summary judgment, and it denied Scottsdale's motion to dismiss the Owners' counterclaim as moot.  These rulings are not at issue in this appeal.

-2-

Scottsdale issued an insurance policy to the Owners (the Policy), and the Policy provided commercial general liability coverage for the vacant building for the time period of September 19 through November 19, 1996.

Falley's, Inc. (Falley's) previously operated a Food-4-Less supermarket in the vacant building, and Falley's continued to lease the building after the supermarket closed in order to prevent any of its competitors from taking over the space and opening up a supermarket to compete with another Food-4-Less supermarket operated by Falley's at a nearby location. Sometime prior to September 1996, the Owners entered into a contract to sell the shopping center to David J. Christie (Christie). However, Christie's obligation to purchase the shopping center was conditioned on him being able to obtain a termination of Falley's leasehold interest in the vacant building. Toward this end, Christie negotiated directly with Falley's to obtain a termination of its lease, and, on September 13, 1996, Falley's entered into a lease termination agreement with the Owners. Under the terms of the agreement, the Owners agreed that neither they nor their assigns would lease the vacant building for the operation of a supermarket for three years.

On October 31, 1996, the sale of the shopping center from the Owners to Christie was finalized. On that same day, Christie deeded most of the shopping center properties, including the vacant building formerly leased by Falley's, to

Albertson's, Inc. (Albertson's), a national supermarket chain and a competitor of Falley's. Thereafter, Albertson's and Falley's became embroiled in a state-court declaratory judgment action in which it was determined that the lease termination agreement executed by the Owners and Falley's did not prohibit Albertson's from operating a supermarket on the premises formerly leased by Falley's. Albertson's then proceeded to construct and open a new supermarket on the premises, which competed with the nearby Food-4-Less supermarket operated by Falley's.

In June 1998, Falley's filed suit against the Owners and Christie in state court in Sedgwick County, Kansas, asserting claims for fraud, breach of contract, and unjust enrichment, and seeking to recover damages for the loss of its leasehold interest and its lost profits as a result of the opening of the Albertson's supermarket. Specifically, with respect to the fraud claim, Falley's alleged that Christie had fraudulently induced it to enter into the lease termination agreement under the false assumption that a competing supermarket would not operate on the premises for at least three years, and that the Owners either participated in the fraudulent scheme or were vicariously liable for Christie's wrongdoing.

Asserting their alleged rights under the Policy, the Owners tendered the defense of the Sedgwick County action to Scottsdale, but Scottsdale refused to provide a defense to the Owners. Instead, Scottsdale filed the instant declaratory judgment action against the Owners seeking a declaration that it had no duty

-4-

under the Policy to defend the Owners in the Sedgwick County action. The district court entered summary judgment in favor of Scottsdale on the duty to defend issue, and this appeal followed.

II.

A. Summary Judgment Standard of Review

"We review a grant of summary judgment de novo, applying the same standard as the district court." *Ferroni v. Teamsters, Chauffeurs & Warehousemen Local No. 222*, 297 F.3d 1146, 1149 (10th Cir. 2002). "Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* Here, there are no genuine issues of material fact. As a result, we need determine only whether the district court correctly concluded that Scottsdale is entitled to summary judgment under the Policy as a matter of law. *See Jones v. Reliable Sec. Incorporation, Inc.*, 28 P.3d 1051, 1059 (Kan. Ct. App. 2001) ("The interpretation of a written [insurance] contract is a question of law. Regardless of the trial court's interpretation, the appellate court may construe the instrument de novo and determine its effect.").

B. Interpretation of Insurance Contracts

Under Kansas law, we must interpret the Policy "in a way that will give effect to the intention of the parties." *Brumley v. Lee*, 963 P.2d 1224, 1226 (Kan. 1998). "If the language is ambiguous, the construction most favorable to the insured must prevail. If the policy is not ambiguous, we do not remake the contract; we enforce the contract as made." *Id.* Further, "the test for ambiguity in an insurance policy is what a reasonably prudent insured would understand the language to mean, not what the insurer intends the language to mean." *Id.* at 1227. In this case, there are no ambiguities in the governing provisions of the Policy. Thus, we "must enforce the unambiguous language according to its plain, ordinary and popular sense." *Cessna Aircraft Co. v. Hartford Accident & Indem. Co.*, 900 F. Supp. 1489, 1497 (D. Kan. 1995).

C. Duty to Defend

Under Kansas law,

[t]he duty to defend and whether the policy provides coverage are not necessarily coextensive. The duty to defend arises whenever there is a potential of liability under the policy. The insurer determines if there is a potential of liability under the policy by examining the allegations in the complaint or petition and considering any facts brought to its attention or which it could reasonably discover.

*Jones,* 28 P.3d at 1058. Consequently, the controlling issue for purposes of this appeal is whether the district court correctly determined that there was no

potential for coverage under the Policy for the claims that Falley's asserted against the Owners in the Sedgwick County action.

D. Property Damage Liability

The Policy provided commercial general liability coverage to the Owners, and Part A of the Policy provided coverage for property damage liability. However, the Policy provided coverage for property damage only if the "'property damage' occur[red] during the policy period." Policy, Section I, Coverage A, ¶ 1(b)(2), Aplt. App. at 58. Under the Policy, the term "property damage" was defined as including "[l]oss of use of tangible property that is not physically injured." *Id.* at Section V, ¶ 15(b), Aplt. App. at 69. The Policy further provided that "[a]ll such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." *Id.*

The district court concluded that, while Falley's petition in the Sedgwick County action sought damages resulting from its loss of use of the supermarket space, the loss of use occurred and was complete on September 13, 1996, when Falley's executed the lease termination agreement. As the district court explained, "after Falley's lease of the supermarket space was terminated, Falley's no longer had any right, title, or expectation of use of the supermarket space. Quite simply, the 'loss of use' was complete." Aplt. App. at 526 (footnote omitted). We agree with the district court's analysis, and we hold that Scottsdale

did not have a duty to defend the Owners under Part A of the Policy since Falley's loss of use occurred prior to the September 19, 1996 effective date of the Policy. [2]

The Owners argue that the district court's analysis is wrong because, while Falley's loss of use began with the termination agreement and thus prior to the effective date of the Policy, the loss of use was active and continuous throughout the policy period. The Owners also argue that Falley's was not actually harmed by the loss of use until October 31, 1996, when Christie sold the supermarket property to Albertson's. Thus, the Owners contend that October 31, 1996, should be the trigger date for coverage because "[h]ad there been no sale of the property to Falley's competitor, there would have been no grounds for a lawsuit." Opening Br. at 29.

Although the Owners' arguments have a certain appeal, the arguments are inconsistent with the governing language in the Policy and the undisputed facts in this case. First, as pointed out by the district court, "the October 31, 1996 transactions did not cause Falley's to suffer a 'loss of use.' Rather, the loss of use occurred when the lease termination agreement was signed, on September 13,

---

[2]    In light of our holding that Falley's loss of use occurred prior to the effective date of the Policy, we need not address the alternative grounds relied on by the district court for granting Scottsdale summary judgment under Part A of the Policy. In addition, we need not address the additional issues and matters raised by Scottsdale in its response brief.

1996." Aplt. App. at 527. Second, while Falley's may not have actually been harmed for purposes of asserting fraud and breach of contract claims against Christie and the Owners under state law until after the transactions on October 31, 1996, occurred, Part A of the Policy does not provide coverage for fraud or breach of contract claims. Rather, Part A of the Policy strictly limits coverage to "'property damage' occur[ring] during the policy period." Policy, Section I, Coverage A, ¶ 1(b)(2), Aplt. App. at 58.

Third, while the owners are correct that, in *Hodgson v. Bremen Farmers' Mut. Ins. Co.*, 3 P.3d 1281, 1284 (Kan. Ct. App. 1999), the Kansas Court of Appeals held that the analysis under an occurrence liability policy must focus "on the event or events which triggered liability," *Hodgson* is inapposite because it did not involve property damage or the issue we are faced with in this case concerning whether property damage occurred within the policy period. Instead, in *Hodgson*, the court was addressing the issue of whether a dog bite and a related slip and fall injury constituted one or two occurrences. *Id.* at 1283-85.

Finally, the Owners argue that Part A of the Policy provides coverage for continuing harms even if the initial harm occurred prior to the effective date of the Policy, and they cite a number of cases in support of this proposition. *See* Opening Br. at 28-32. However, the cases relied on by the Owners are distinguishable because they involved either: (1) repeated instances of property

damage as a result of the property being continually exposed to some form of environmental contamination or other physical intrusion; [3] or (2) separate and repeated transactions such as multiple instances of fraud committed against different individuals or multiple cases of food poisoning; [4] or (3) occurrence liability policies which required that the "occurrence" or "accident" occur during the policy period, [5] as opposed to the Policy here which required that the "property damage" occur during the policy period.

---

[3]    *See Cessna*, 900 F. Supp. at 1499-1503 (analyzing property damage caused by pollutants seeping into groundwater); *E & L Chipping Co. v. Hanover Ins. Co.*, 962 S.W.2d 272, 275 (Tex. Ct. App. 1998) (analyzing property damage caused by releases of contaminated run-off water); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278, 1302-04 (D. Utah 1994) (analyzing property damage caused by discharges of hazardous wastes), *aff'd*, 52 F.3d 1552 (10th Cir. 1995); *Borg v. Transamerica Ins. Co.*, 54 Cal. Rptr. 2d 811, 817-20 (Cal. Ct. App. 1996) (analyzing property damage caused by a structural encroachment from an adjoining property); *Gruol Constr. Co. v. Ins. Co. of N. Am.*, 524 P.2d 427, 430 (Wash. Ct. App. 1974) (analyzing property damage caused by dry rot to the foundation of an apartment building).

[4]    *See Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 206-07 (5th Cir. 1971) (holding that each sale of contaminated bird seed was a separate "occurrence"); *Mich. Chem. Corp. v. Am. Home Assurance Co.*, 728 F.2d 374, 382-83 (6th Cir. 1984) (holding that each shipment of contaminated livestock feed was a separate "occurrence"); *N. River Ins. Co. v. Huff*, 628 F. Supp. 1129, 1133-34 (D. Kan. 1985) (holding that each loan swap transaction was a separate "occurrence").

[5]    *See Stillwell v. Brock Bros., Inc.*, 736 F. Supp. 201, 205-07 (S.D. Ind. 1990) (holding that there was no "occurrence" or "accident" during the period the policy was in effect where, although negligent roof repairs were made during the policy period, occupants of home were not physically injured and no property damage occurred as a result of the repairs until after the expiration of the policy).

The cases relied on by the Owners address a number of the recurring and difficult issues that arise under occurrence liability policies, but they do not support the Owners' claim that Falley's sustained property damage in the form of a loss of use during the policy period. Thus, the district court correctly determined that there was no potential for coverage under Part A of the Policy, and we affirm the entry of summary judgment in favor of Scottsdale under Part A.

E.  Personal Injury Liability

Part B of the Policy provided personal injury liability coverage to the Owners. Specifically, the Policy provided that it applied to "'[p]ersonal injury' caused by an offense arising out of [the Owners'] business, . . . but only if the offense was committed . . . during the policy period." Policy, Section I, Coverage B, ¶ 1(b)(1), Aplt. App. at 61. The Policy then defined "personal injury" as follows:

> 13. 'Personal injury' means injury, other than 'bodily injury', arising out of one or more of the following offenses:
>
>       . . . .
>
>       c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor[.]

*Id.* at Section V, ¶ 13(c), Aplt. App. at 68.

The parties do not dispute that the alleged "wrongful eviction" of Falley's from the supermarket space, and/or the alleged "invasion" of Falley's rights under its lease with the Owners, is the "offense" at issue in this case. The only dispute is whether the district court correctly determined that the offense occurred on September 13, 1996 when Falley's signed the lease termination agreement, and thus prior to the effective date of the Policy.

The Owners' arguments under Part B of the Policy are similar to their arguments under Part A, as they argue that an "offense" under Part B "can be a continuing one and comprised of discrete acts." Opening Br. at 42. In addition, they argue that Christie's conveyance of the supermarket property to Albertson's on October 31, 1996, was the "liability-triggering offense" under Part B of the Policy. *Id.* at 44.

As with their arguments under Part A of the Policy, there is a certain logic to the Owners' arguments under Part B. Nonetheless, we agree with the district court that the "offense" for purposes of Part B occurred on September 13, 1996, when Falley's executed the lease termination agreement. According to Falley's state-court petition, that is the point in time when Falley's formally agreed to terminate all of its rights in the lease as a result of Christie's fraudulent inducements, *see* Aplt. App. at 86-88, and it is undisputed that the termination of Falley's rights was complete on that date. Thus, as found by the district court,

because the Policy did not provide coverage for fraud or breach of contract claims, "[a]ny event occurring after [September 13, 1996] is inconsequential to [Part B of] the policy." *Id.* at 537. Accordingly, the district court correctly determined that there was no potential for coverage under Part B of the Policy, and we affirm the entry of summary judgment in favor of Scottsdale under Part B.

The judgment of the district court is AFFIRMED.

Entered for the Court


David M. Ebel
Circuit Judge

-13-